IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

D&M HOLDINGS INC. d/b/a THE D+M
GROUP, D&M HOLDINGS U.S. INC.,

       Plaintiffs,

v.

Civil Action No. 16-141-RGA

SONOS, INC.,

       Defendant.

MEMORANDUM OPINION

Jack B. Blumenfeld, Esq., MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE;
Michael J. Flynn, Esq., MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE; John
M. Jackson, Esq., JACKSON WALKER LLP, Dallas, TX; Matthew C. Acosta, Esq. (argued),
JACKSON WALKER LLP, Dallas, TX; Blake T. Dietrich, Esq., JACKSON WALKER LLP,
Dallas, TX; David Folsom, Esq., JACKSON WALKER LLP, Texarkana, TX.

Attorneys for Plaintiffs

Phillip A. Rovner, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, DE; Jonathan
A. Choa, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, DE; George I. Lee, Esq.,
LEE SULLIVAN SHEA & SMITH, LLP, Chicago, IL; Sean M. Sullivan, Esq., LEE SULLIVAN
SHEA & SMITH, LLP, Chicago, IL; Rory P. Shea, Esq. (argued), LEE SULLIVAN SHEA &
SMITH, LLP, Chicago, IL; J. Dan Smith, Esq., LEE SULLIVAN SHEA & SMITH, LLP, Chicago,
IL; Michael P. Boyea, Esq., LEE SULLIVAN SHEA & SMITH, LLP, Chicago, IL.

Attorneys for Defendant

April 18, 2017

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is Defendant's Motion to Dismiss Plaintiffs' First, Second, Third, Fourth, Fifth, Seventh, and Eighth Counterclaims. (D.I. 9). The issues have been fully briefed. (D.I. 10, 17, 19). The Court held oral argument on November 14, 2016. (D.I. 41) ("Hr'g Tr."). For the reasons that follow, the Court will deny Defendants' motion.

## I. BACKGROUND

This patent infringement lawsuit began when Plaintiffs requested leave to add counterclaims in a related action filed by Defendant against Plaintiffs on October 21, 2014. (Civ. Act. No. 14-1330, D.I. 81). The Court granted leave but severed these infringement counterclaims into the instant case. (Civ. Act. No. 14-1330, D.I. 100). Plaintiffs assert nine patents in their counterclaims. (D.I. 1). Defendants have moved to dismiss seven of these counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (D.I. 9). Defendant alleges that four of the asserted patents are invalid under 35 U.S.C. § 101 because each of these patents claims an unpatentable abstract idea. (D.I. 10 at 6). These patents are U.S. Patent Nos. 7,343,435 ("the '435 patent"), 7,734,850 ("the '850 patent"), 6,539,210 ("the '210 patent"), and 7,305,694 ("the '694 patent"). (*Id.*). Defendant further alleges that three of Plaintiffs' counterclaims fail to state a plausible claim for infringement. (*Id.* at 7). These counterclaims relate to U.S. Patent Nos. 8,755,667 ("the '677 patent"), 6,469,633 ("the '633 patent"), and 7,995,899 ("the '899 patent"). (*Id.*).

## II. LEGAL STANDARD

### A. Patentable Subject Matter under 35 U.S.C. § 101

Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or

composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has recognized an implicit exception for three categories of subject matter not eligible for patentability—laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The purpose of these carve outs is to protect the "basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 556 U.S. 66, 71 (2012). "[A] process is not unpatentable simply because it contains a law of nature or a mathematical algorithm," as "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Id.* at 1293-94 (internal quotation marks and emphasis omitted). In order "to transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Id.* at 1294 (emphasis omitted).

The Supreme Court recently reaffirmed the framework laid out in *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, the court must determine whether the claims are drawn to a patent-ineligible concept. *Id.* If the answer is yes, the court must look to "the elements of the claim both individually and as an 'ordered combination'" to see if there is an "'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (alteration in original). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* at 2357

2

(alterations in original) (quoting *Mayo*, 556 U.S. at 77). "[S]imply appending conventional steps, specified at a high level of generality, to ... abstract ideas cannot make those ... ideas patentable." *Mayo*, 556 U.S. at 82. Further, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Alice*, 134 S. Ct. at 2358 (quoting *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010)). Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* For this second step, the machine-or-transformation test can be a "useful clue," although it is not determinative. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015).

Patent eligibility under § 101 is a question of law suitable for resolution on a motion to dismiss. *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1346 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 119 (2015). The Federal Circuit follows regional circuit law for motions to dismiss. *Content Extraction*, 776 F.3d at 1346. When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must accept the complaint's factual allegations as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

The Federal Circuit has held that the district court is not required to individually address claims not asserted or identified by the non-moving party, so long as the court identifies a representative claim and "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation marks omitted).

3

## B.    Patent Infringement Pleading Standards

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. Prior to December 1, 2015, Form 18 directed plaintiffs in patent infringement suits to plead their infringement allegations in a particular way. Fed. R. Civ. P. Form 18 (abrogated Dec. 1, 2015). Specifically, Form 18 enabled plaintiffs to meet a four-part pleading standard requiring them to allege (1) jurisdiction; (2) ownership of the patent; (3) defendant's infringement "by making, selling, and using [the device] embodying the patent"; and (4) a demand for relief. *In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323, 1334 (Fed. Cir. 2012).

On December 1, 2015, amendments to the Federal Rules went into effect abrogating Form 18. The order adopting the amendments explained that the changes "shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." Supreme Court of the United States, *Order Regarding Amendments to the Federal Rules of Civil Procedure* (U.S. Apr. 29, 2015).

For cases filed after Form 18 was abrogated, patent infringement allegations are evaluated under the plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Under this standard, a Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). The Court is "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A complaint may not be dismissed, however, "for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 347. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [complainant] pleads factual content that allows the court to draw the reasonable inference that the [defendant] is liable for the misconduct alleged." *Id.* Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III. DISCUSSION

### A. Motion to Dismiss Plaintiffs' First Counterclaim for Infringement of the '435 Patent

In their First Counterclaim, Plaintiffs assert both direct and indirect infringement of the '435 patent. (D.I. 1, ¶¶ 19-27). The '435 patent contains two independent claims: claim 1 and claim 9. In briefing, Defendant argued that claim 1 is representative. [1] (D.I. 10 at 11). Claim 1 reads:

---

[1] In their initial infringement contentions, Plaintiffs asserted claims 1-3. (D.I. 1-2 at 4-11). In briefing and at oral argument, Plaintiffs argued that Defendant had not shown that claim 1 is representative. (D.I. 17 at 6; Hr'g Tr. at 27:14-17). Plaintiffs did not offer any argument as to why claim 1 is not representative. At oral argument in the companion case, Civ. Act. No. 14-1330, on November 14, 2016 (later in the same day as oral argument in this case), the parties were directed to submit additional briefing to the extent that they felt the claims of each of the patents that were argued at the hearing were not representative. (Civ. Act. No. 14-1330, D.I. 206 at 62:5-8). The parties waited until February 1, 2017 to propose substantial additional briefing on this issue in a Joint Stipulation. (D.I. 46). On February 2, I denied the parties' Joint Stipulation, finding that the parties had waived any argument that the claims of each patent addressed in briefing and at oral argument are not representative. (D.I. 47).

5

1. A method of determining a recovery state in a data stream, comprising:
    receiving a compressed data stream;
    detecting a compression block boundary in the compressed data stream;
    detecting an archive block boundary in the compressed data stream;
    detecting a file boundary in the compressed data stream; and
    in response to the detection of the compression block boundary, the
archive block boundary, and the file boundary, saving a recovery state for the
compressed data stream;
    wherein the recovery state includes a position of the compression block
boundary, and a position of the file boundary.

('435 patent, claim 1).

"First, we determine whether the claims at issue are directed to [an abstract idea]." *Alice*,

134 S. Ct. at 2355. "The 'abstract ideas' category embodies 'the longstanding rule that an idea

of itself is not patentable.'" *Id.* (internal quotation marks omitted) (quoting *Gottschalk v.

Benson*, 409 U.S. 63, 67 (1972)). "The Supreme Court has not established a definitive rule to

determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice*

inquiry." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). The Supreme

Court has recognized, however, that "fundamental economic practice[s]," *Bilski*, 561 U.S. at 611,

"method[s] of organizing human activity," *Alice*, 134 S. Ct. at 2356, and mathematical

algorithms, *Benson*, 409 U.S. at 64, are abstract ideas. In navigating the parameters of such

categories, courts have generally sought to "compare claims at issue to those claims already

found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334. "But in

determining whether the claims are directed to an abstract idea, we must be careful to avoid

oversimplifying the claims because '[a]t some level, all inventions . . . embody, use, reflect, rest

upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *In re TLI Commc'ns LLC

Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (alterations in original) (quoting *Alice*, 134 S.

Ct. at 2354).

6

Defendant asserts that, like the concept of gathering and combining data in *Digitech*, the '435 patent seeks to claim "an abstract process of receiving, detecting, and storing data that is not tied to any device whatsoever." (D.I. 10 at 11-12). Defendant further analogizes the claims of the '435 patent to those at issue in *Content Extraction*, where the Federal Circuit invalidated a patent that claimed the abstract idea of collecting, recognizing, and storing data. (*Id.* at 12).

Plaintiffs counter that Defendant is oversimplifying in characterizing the invention. (D.I. 17 at 10-11). Plaintiffs assert that the invention is "directed to a method of determining and using recovery state information to recover from interruptions occurring during a data stream transfer." (*Id.* at 11). Plaintiffs cite no cases in support of their contention that this patent is not directed to an abstract idea. Instead, Plaintiffs attempt to distinguish this case from those cited by Defendant. (*Id.*).

I agree with Defendant that claim 1 of the '435 patent is directed to an abstract idea. As the Federal Circuit has held numerous times, collecting information is "within the realm of abstract ideas." *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). Claim 1 of the '435 patent requires: 1) receiving a compressed data stream; 2) detecting compression block, archive block, and file boundaries; and 3) saving the information detected in step 2. This is precisely the kind of claim that the Federal Circuit has found to be an abstract idea, as it is directed to the concept of collecting and storing data. *See Electric Power Group*, 830 F.3d at 1353 (claims directed to abstract idea of collecting and analyzing information, and displaying results); *TLI Commc'ns*, 823 F.3d at 613 (claims directed to abstract idea of classifying, organizing, and storing digital images"); *Content Extraction*, 776 F.3d at 1347 (claims drawn to abstract idea of collecting, recognizing, and storing data); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) (claims drawn to

7

abstract idea of "organizing information through mathematical correlations"). Furthermore, the method is not tied to a specific device or structure. *Digitech*, 758 F.3d at 1350.

Plaintiffs contend that claim 1 of the '435 patent is distinguishable from the claims found patent ineligible in *Content Extraction*. (D.I. 17 at 11). According to Plaintiffs, "the '435 patent describes specific methods of monitoring data transfers and communications among various devices and recovering from potential interruptions to the data streams." (*Id.*). Plaintiffs state this conclusion without any argument in support. I disagree with Plaintiffs' characterization of claim 1. Nowhere in this claim is there any mention of "recovering from potential interruptions." Furthermore, data transfers and communications between devices are well-known and conventional, as are compressed archive files; Plaintiffs do not contend otherwise. (Hr'g Tr. at 30:9-11). There is simply nothing more "specific" about the method in this claim than the fact that it is to be applied to transfers of compressed data streams.

There is also nothing new or improved about the type of data that is received or how it is stored according to the claimed method. The patent specifies that "data files are often downloaded in . . . compressed format." ('435 patent at 1:8-9). As detailed in the specification, the claimed method operates on "a conventional compressed archive." (*Id.* at 1:40). The specification details how a conventional compressed archive is formed and reveals that the archive block, compression block, and file boundaries are also conventional. (*Id.* at 1:40-54). The claimed method requires only that the information about file, archive block, and compression block boundaries be detected and stored. The method does not claim anything new or inventive about how this conventional information is stored, does not require any analysis or manipulation of the data, and does not even specify that the data that is stored ever be used for anything. In other words, the method claimed in the '435 patent claims nothing more than

8

receiving a conventional compressed archive, detecting conventional information about file, archive block, and compression block boundaries within the data stream, and storing this detected information.

There is also nothing in the claim that represents an improvement in existing technology. *See Enfish*, 822 F.3d at 1337 (finding claims directed to new type of database that represented "an improvement of an existing technology" not abstract). The specification purports to provide an improved method for compressed file downloads that solves problems associated with interruptions of such downloads. ('435 patent at 2:4-24). Claim 1, however, does not address this problem; there is nothing in the claim language that is directed to recovering from an interruption.

Therefore, I find that the '435 patent is directed to the abstract idea of receiving, detecting, and storing information.

The determination that a patent is directed to an abstract idea "does not render the subject matter ineligible." *Internet Patents*, 790 F.3d at 1346. Having decided that the patent's claims are directed to an abstract idea, the Court must next "determine whether the claims do significantly more than simply describe the abstract method." *Ultramercial*, 772 F.3d at 715. Since "a known idea, or one that is routine and conventional, is not inventive in patent terms," this analysis "favors inquiries analogous to those undertaken for determination of patentable invention." *Internet Patents*, 790 F.3d at 1346. Indeed, the Federal Circuit has noted that the two stages of the *Alice* two-step inquiry "are plainly related" and "involve overlapping scrutiny of the content of the claims . . . ." *Elec. Power Grp.*, 830 F.3d at 1353. Furthermore, neither "[a] simple instruction to apply an abstract idea on a computer," nor "claiming the improved speed or

9

efficiency inherent with applying the abstract idea on a computer" satisfies the requirement of an "inventive concept." *Intellectual Ventures*, 792 F.3d at 1367.

Defendant argues that claim 1 lacks an inventive concept because the claim "do[es] not recite any specific, non-conventional steps" and because the claim is "not tied to any machine – let alone a specific machine." (D.I. 10 at 13 (emphasis omitted)). Plaintiffs have not stated what inventive concept they believe is embodied in this claim. Instead, Plaintiffs argue that Defendant has not met its burden under step two. (D.I. 17 at 11).

Plaintiffs first contend that Defendant's argument relies "on an unsupported construction of the term 'compressed data stream.'" (*Id.* at 11-12). Plaintiffs do not, however, explain how a different construction of the term would make any difference in this analysis. Indeed, Defendant's analysis rests on Plaintiffs' proposed construction of the term. (D.I. 18-1 at 2). Plaintiffs even acknowledged at oral argument that the compressed data archive of the claim is conventional and well-known. (Hr'g Tr. at 30:8-11). Therefore, I find this argument irrelevant.

Plaintiffs next complain that Defendant "ignores the claim term 'recovery state.'" (*Id.* at 12). Plaintiffs do not, however, explain how the inclusion of the term "recovery state" imparts an inventive concept to this claim. Nor could they. The claim itself makes clear that "recovery state" is simply the name given to the information detected in the data stream that is then stored. Plaintiffs have not proposed any different interpretation of the term, nor have they provided any explanation of how the "recovery state" injects an inventive concept into this claim. I am not persuaded that simply giving this conventional information a name imparts an inventive concept to this claim.

Plaintiffs next contend that Defendant's "arguments routinely bleed over to issues of novelty and obviousness." (D.I. 17 at 12). Plaintiffs fail to identify a single specific argument

10

made by Defendant, however, that would constitute an attack on novelty or obviousness rather than patentable subject matter. I fail to see such an argument in Defendant's step two analysis.

Plaintiffs next argue that Defendant has not shown that claim 1 "unreasonably preempts the abstract concept of 'receiving, detecting, and storing data.'" (*Id.*). Plaintiffs appear to be arguing that an abstract idea is only patent ineligible if it would preempt the field. This is incorrect. The Supreme Court has described preemption as a policy concern underlying the determination of patent eligibility. *Alice*, 134 S.Ct. at 2354. Preemption is not the test for patentability, however. Furthermore, I am not convinced that this claim is specific enough to alleviate any preemption concerns. According to Plaintiffs, "The specificity of the recovery state and associated method alleviates any concerns of unreasonable [preemption]." (D.I. 17 at 12). I disagree. Plaintiffs contend that this patent "provide[s] a specific solution for a specific problem . . . that arises in the computer specific context." (*Id.*). The problem Plaintiffs identify is "recovery of data stream transmission after interruptions." (*Id.*). This purported specificity is completely missing from the claim, however. Claim 1 is not tethered to any specific devices. Rather, this claim mentions only a data stream. The specification states that the "method described can be applied to the transfer of data between any two electronic devices." ('435 patent at 5:59-60). In other words, this claim is broadly directed to a generic computer environment. *Elec. Power Grp.*, 830 F.3d at 1355. The claim "do[es] not even require a new source or type of information, or new technology for analyzing it." *Id.* Furthermore, "Where a patent's claims are deemed only to disclose patent ineligible subject matter under the Mayo framework, as they are in this case, preemption concerns are fully addressed and made moot." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015). Therefore,

11

having found that this claim is directed to an abstract idea, I find that Plaintiffs' preemption argument is moot.

Finally, Plaintiffs argue that Defendant did not address the machine-or-transformation test, application of which, Plaintiffs contend, confirms that claim 1 is patent-eligible. (D.I. 17 at 12-13). The Supreme Court has held that although the machine-or-transformation test is not determinative in a § 101 analysis, it may provide guidance in the *Mayo/Alice* step two analysis. *Ultramercial*, 772 F.3d at 716. Under this test, a claimed process is patent-eligible if, "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008). Plaintiffs argue that the claimed method of the '435 patent "transform[s] a particular article into a different state or thing, namely conversion of a compressed data stream into a set of independently functioning parameters such as recovery state." (D.I. 17 at 13). I disagree. Even if the data stream could be considered an "article," I do not think that extracting information from that data stream, which is essentially a data gathering step, constitutes a transformation of anything. The Federal Circuit has cautioned that, "at least in most cases, gathering data would not constitute a transformation of any article." *Bilski*, 545 F.3d at 963. Therefore, I find that this claim fails the machine-or-transformation test.

For the reasons given above, I find that claim 1 of the '435 patent is drawn to an abstract idea and the claim does not provide an inventive concept. Therefore, I will grant Defendant's Motion to Dismiss Plaintiffs' First Counterclaim.

## B. Motion to Dismiss Plaintiffs' Seventh Counterclaim for Infringement of the '850 Patent

In their Seventh Counterclaim, Plaintiffs assert both direct and indirect infringement of the '850 patent. (D.I. 1, ¶¶ 73-81). The '850 patent contains three independent claims: claim 1,

12

claim 5, and claim 10. In briefing Defendant argued that claim 1 is representative.[2] (D.I. 10 at

14). Claim 1 reads:

1. A method of resuming an interrupted data stream transfer comprising:
    obtaining recovery state information, including a stored compression
    block boundary position and a stored file boundary position of the interrupted
    data stream transfer;
    resuming the data stream transfer by requesting a compressed data stream
    starting with the stored compression block boundary position;
    advancing through the resumed data stream transfer to reach the stored file
    boundary position by decompressing data from the stored compression block
    boundary position to the stored file boundary position;
    once the file boundary position has been reached, decompressing and de-
    archiving data after the file boundary position; and
    storing the de-archived data in a destination filesystem.

('850 patent, claim 1).

Defendant's only argument that this claim is directed to an abstract idea is that it is

"similar to the asserted '435 claims – it is directed to the bare concept of receiving, manipulating,

and storing data." (D.I. 10 at 14). Defendant offers nothing in its *Alice* step one analysis beyond

this conclusory statement.

Plaintiffs counter that Defendant's argument fails for the same reasons discussed above

for the '435 patent. (D.I. 17 at 13-14). Plaintiffs also note that Defendant's characterization of

the abstract idea differs from what was offered for the '435 patent. (*Id.* at 14). While Defendant

characterized the '435 patent as directed to the abstract idea of receiving, detecting, and storing

data, Defendant characterizes the '850 patent as directed to receiving, manipulating, and storing

data. (*Id.*). Defendant responds that the basic concepts of data detection and manipulation "are

both abstract ideas." (D.I. 19 at 7).

I agree with Plaintiffs that Defendant has oversimplified and ignored specific limitations

in this claim. This claim is more specific than claim 1 of the '435 patent and calls for more than

---

[2] The parties have waived any argument that claim 1 is not representative. *See supra* note 1.

simply receiving, manipulating, and storing data. The claimed method requires: 1) retrieving stored information about compression block, archive block, and file boundaries; 2) using the retrieved compression block boundary to determine a starting position for resumption of a data stream transfer; 3) actually resuming the data stream transfer starting at the position determined in step 2; 4) using the retrieved file boundary to determine where to resume data decompression; 5) decompressing and de-archiving data beginning at the position determined in step 4; 6) storing the de-archived data from step 5. To characterize this process as nothing more than receiving, manipulating, and storing data ignores the limitations of at least steps 3, 4, and 5.

It seems to me that the data that is retrieved in step 1 is then used to accomplish something tangible – the resumption of an interrupted file download. This is distinguishable from the claim at issue in *Electric Power Group* which claimed a method of "gathering and analyzing information . . . and not any particular assertedly inventive technology for performing these functions." *Electric Power Group*, 830 F.3d at 1354. In contrast, this claim is more like the one at issue in *Enfish* as it represents a specific improvement in a computer's capabilities; specifically, this claim represents an improvement in resuming interrupted downloads. *Enfish*, 822 F.3d at 1339.

This claim is also distinguishable from the claim at issue in *Digitech*. While this claim is not tied to a specific structure or machine, like the claim in *Digitech*, the difference lies in the way the data is used in this claim. In *Digitech*, the claimed method involved "taking two data sets and combining them into a single data set." *Digitech*, 758 F.3d at 1351. The claimed process consisted of nothing more than "manipulat[ing] existing information to generate additional information." *Id.* In contrast, the process of claim 1 of the '850 patent is not directed

14

merely to generating information. Rather, it is directed to the use of information in a very specific way to solve the problem of interrupted file downloads.

For the reasons given above, I find that the '850 patent claims patent-eligible subject matter under § 101. Having found that the claims are not drawn to an abstract idea under step one, it is unnecessary for me to proceed to step two.

## C. Motion to Dismiss Plaintiffs' Second Counterclaim for Infringement of the '210 Patent

In their Second Counterclaim, Plaintiffs assert both direct and indirect infringement of the '210 patent. (D.I. 1, ¶¶ 28-36). The '210 patent contains ten independent claims: claims 1, 14-16, 30, 31, and 41-44. In briefing Defendant argued that claim 1 is representative. (D.I. 10 at 15). Claim 1 reads:

1. A method of identifying signal sources, comprising:
   selecting a communication medium from a plurality of communication media, to supply a signal;
   storing medium selection data identifying the communication medium;
   obtaining the signal from a signal source via the communication medium; and
   accessing at least one database from a data source separate from the signal source to obtain signal information about the signal source.

('210 patent, claim 1).

Defendant contends that the '210 patent is "directed to the abstract idea of obtaining information about a signal source." (D.I. 10 at 15). According to Defendant, this is an abstract idea because the claimed method can be "performed entirely by a human without a computer." (*Id.* at 16). Plaintiffs counter that Defendant's characterization of the abstract idea represents a "moving target" that makes "clear that [Defendant] has raised a dispute that requires formal claim construction." (D.I. 17 at 14-15). Plaintiffs contend that their proposed constructions "inject sufficient specificity and concreteness" to render the claims patent-eligible. (*Id.* at 15).

15

I have reviewed the parties' proposed claim constructions for this patent. (D.I. 49-1 at 5-

10). It seems to me that construction of at least some of the disputed terms could impact the

§ 101 analysis, particularly as there is a dispute over whether the structure in several of the

means-plus-function terms, which are found in claims that were not briefed or argued, is a

specific device or merely a general purpose computer. (*Id.*). Therefore, I decline to opine on

whether this patent is directed to an abstract idea at this stage of the litigation and I will deny

Defendant's Motion to Dismiss Plaintiffs' Second Counterclaim.

## D.    Motion to Dismiss Plaintiffs' Third Counterclaim for Infringement of the '694 Patent

In their Third Counterclaim, Plaintiffs assert both direct and indirect infringement of the

'694 patent. (D.I. 1, ¶¶ 37-45). The '694 patent contains four independent claims: claims 1, 14,

18, and 29. In briefing Defendant argued that claim 18 is representative.[3] (D.I. 10 at 18). Claim

18 reads:

18. A method for controlling a receiver having a plurality of receiver connections, the
method comprising:
    querying a user to select a receiver connection of the plurality of receiver
connections to correspond with each encoding format of a plurality of encoding
formats;
    retrieving media unit data that identifies an encoding format of a playable piece of
media selected to be played by the receiver, wherein the identified encoding format is
one of the plurality of encoding formats;
    retrieving receiver-connection data that identifies the receiver connection
corresponding with the identified encoding format; and
    sending to the receiver a control signal instructing the receiver to use the
identified receiver connection for receiving a media signal of the selected media.

('694 patent, claim 18).

---

[3] The parties have waived any argument that claim 18 is not representative. *See supra* note 1. Defendant briefed
claim 18 as representative because at the time this motion was briefed, that was the only independent claim Plaintiffs
had asserted. (Hr'g Tr. at 37:9-11). Plaintiffs later asserted claim 1. (Hr'g Tr. at 37:12-14). Claim 1 is directed to
an apparatus for carrying out the method of claim 18. Since the parties addressed claim 18 in briefing and at oral
argument, this is the claim I will address as representative for the purposes of this opinion.

Defendant contends that claim 18 "is directed to the practice of selecting a receiver connection for a playable piece of media based on the media's encoding format." (D.I. 10 at 18). According to Defendant, this is an abstract idea because it can be "performed entirely by a human." (*Id.*). Plaintiffs respond that "this characterization represents only a fraction of the claimed invention." (D.I. 17 at 16). Plaintiffs further contend that Defendant "overlooks important claim limitations" in arguing that the claimed method could be performed by a human. (*Id.* at 17). Plaintiffs contend that the method of claim 18 is directed to "analyz[ing] an encoding format, analyz[ing] data from a receiver, and based on that, choos[ing] the actual media that is being played." (Hr'g Tr. at 39:16-18). This, according to Plaintiffs, is not something a human could do. (Hr'g Tr. at 39:18-19).

I agree with Defendant that this claim is directed to the automation of a process that can be (and has been) performed by humans. Performing the method of claim 18 requires the following steps: 1) asking a user to match a receiver connection with an encoding format; 2) identifying the encoding format of a selected piece of media; 3) identifying the receiver connection matched to the encoding format in step 1; 4) telling the receiver to use the receiver connection found in step 3. The patent's specification confirms that this process is typically performed manually by the user each time a piece of media is selected for playback in a media management system. ('435 patent at 1:59-61). The patent describes such manual configuration as "burdensome to the user" and suggests that "a need exists for automatically configuring receivers to play media . . . according to the characteristics of the media." (*Id.* at 1:66-2:3).

Plaintiffs argue that the claimed method cannot be performed by a human because the claim requires analysis of an encoding format and analysis of data from a receiver (i.e., steps 2 and 3 above). (Hr'g Tr. at 39:14-19). It seems to me that suggesting that retrieving data, which

17

is all the claim recites, involves analysis of that data is overstating what the claim calls for. Claim 18 calls for "retrieving media unit data that identifies and encoding format." There is no analysis explicitly mentioned in this claim, nor is any analysis implied. Therefore, I find that this claim is drawn to the abstract idea of selecting a receiver connection for a piece of media based on the media's encoding format.

Moving to step two of the *Alice* framework, Defendant asserts that the claim fails to provide an inventive concept because it is directed to automating the abstract idea "through the use of generic, conventional technology." (D.I. 10 at 19). Plaintiffs do not identify any inventive concept embodied in this claim; instead, Plaintiffs cite to their proposed claim constructions, which they claim "demonstrates the inventive concept recited in Claim 18." (D.I. 17 at 18). Plaintiffs do not explain, however, how their proposed constructions impart an inventive concept. Nor could they. The limitations in claim 18 simply represent the automation of a conventional process using a conventional receiver.

Plaintiffs analogize this claim to the claim at issue in *AMDOCS*, arguing that this claim solves a problem in a narrow technological environment. (Hr'g Tr. at 41:9-21). I disagree. The claim in *AMDOCS* did indeed offer a solution to a technological problem in which generic computers "operate[d] in an unconventional manner to achieve an improvement in computer functionality." *AMDOCS (Israel) Limited v. Opennet Telecom, Inc.*, 841 F.3d 1288, 1300-01 (Fed. Cir. 2016). The problem with Plaintiffs' argument is that they have not identified what problem is being solved by this claim. The only problem the patent itself speaks to is the burden on the user of having to manually configure a receiver each time a piece of media is played. ('435 patent at 1:56-67). This problem is solved through automation of the process. (*Id.* at 2:1-3). Another problem with Plaintiffs' analogy is that the technology in this claim is not being

18

operated in an unconventional manner. The patent itself discloses that the claimed process was conventionally performed manually. (*Id.* at 1:56-67).

Plaintiffs also attempt to draw an analogy with *DDR*, arguing that this claim is directed to "a more specific technological environment" than in that case where the claims were found patent-eligible. (Hr'g Tr. at 42:2-5). *DDR*, however, involved a method directed to a specific problem, retaining customers who click a hyperlink that would typically take them to another merchant's website. *DDR*, 773 F.3d at 1258. Here, as I have already stated, Plaintiffs have not identified a specific problem solved by this patent. Furthermore, although *DDR* involved the generic technological environment of the Internet, the claimed method produced "a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* In this case, the result of the claimed method is exactly the "routine and conventional" result that one would obtain when manually configuring a receiver.

Finally, Plaintiffs argue that there are no preemption issues "because claim 18 describes use of technology that overrides the routine and conventional sequence of events to communicate where it was previously impossible." This argument is moot, however, since I have already determined that this claim is directed to an abstract idea. *Ariosa Diagnostics*, 788 F.3d at 1379.

For the reasons given above, I find that the '694 patent is drawn to an abstract idea and the claims do not provide an inventive concept. Therefore, I will grant Defendant's Motion to Dismiss Plaintiffs' Third Counterclaim.

## E. Motion to Dismiss Plaintiffs' Fourth, Fifth, and Eighth Counterclaims for Failure to State a Claim

The counterclaims that form the basis for this case were docketed on March 7, 2016, four months after the rule changes took effect. (D.I. 1). Therefore, Plaintiffs must meet the *Twombly/Iqbal* standard for facial plausibility.

19

To determine whether Plaintiffs have plausibly alleged a claim for patent infringement, I

begin with the language of the claims. *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*,

287 F.3d 1108, 1118 (Fed. Cir. 2002). On a motion to dismiss, I will not engage in claim

construction or look beyond the four corners of the complaint.

The '633 patent contains three independent claims: claims 1-3. Claim 1 reads:

1.     An apparatus controlling at least one electrical device, comprising:
       a display device to display representations of controls for a currently selected
device and one of video signals from the currently selected device and a
representation of the currently selected device;
       a remote control transmitter, including a user interface consisting of only a cursor
moving control and buttons to select one of icons and text displayed on said display
device and what is displayed at a cursor position, to transmit a user generated signal
indicating selection of a position on said display device corresponding to a selected
control representation;
       a remote control receiver to receive the user generated signal from said remote
control transmitter;
       a processor, coupled to said remote control receiver, to determine the position on
said display device selected by the user generated signal and control operations
corresponding thereto; and
       a device controller, coupled to said processor and the at least one electrical
device, to control operation of the at least one electrical device in accordance with the
control operations corresponding to the position selected by the user generated signal.

('633 patent, claim 1). Plaintiffs' preliminary infringement chart provides detailed factual

allegations specifying how Defendant's devices infringe each element of claims 1 and 3 of the

'633 patent. (D.I. 1-2 at 25-31). Defendant argues, however, that Plaintiffs have not plausibly

alleged infringement of several limitations of these claims. (D.I. 10 at 22). Plaintiffs counter

that Defendant's arguments rely on a narrow construction of the claim limitations. (D.I. 17 at

21-23).

I agree with Plaintiffs. For example, Defendant points to the remote control transmitter

limitation and argues that the claim language "consisting of only a cursor moving control and

buttons to select one of icons and text displayed on said display device and what is displayed at a

cursor position" necessarily means that the remote control transmitter and display device must be separate and distinct devices. (D.I. 10 at 22-23). I do not think this claim language is so clear that this issue can be resolved as a matter of law on a motion to dismiss. Whether the two devices must be separate and distinct is an issue that will be resolved during claim construction. Defendant's arguments about other claim limitations, such as whether the devices play "video signals" (*Id.* at 22) and whether the devices have a "full screen mode" (*Id.* at 24), fail for the same reason. Plaintiffs' allegations address each limitation of the asserted claims and these allegations are plausible.

Defendant's arguments with respect to the '667 patent are similarly unavailing. Claim 1 of the '667 patent reads:

1. A method of inputting text associated with a recording, comprising:
    playing the recording on a video screen;

    during playback of the recording, detecting a first text character entered by a keyboard;

    in response to detection of the first text character, determining whether a title of the recording is previously stored, and then only if the title of the recording is not previously stored, entering a text input mode, wherein in text input mode playback of the recording is continued on at least a portion of the video screen, and wherein the first text character is displayed on the video screen;

    if text input mode is entered, then during the text input mode, receiving subsequent text characters entered by the keyboard and displaying the subsequent text characters on the video screen; and

    if text input mode is entered, then storing the first text character and subsequent text characters as text associated with the recording.

('667 patent, claim 1). Defendant argues that its device is an audio system and that Plaintiffs have failed to plausibly allege that its device plays a "recording on a video screen" as required by the claim. (D.I. 10 at 21). Defendant's argument is premised on its contention that the claim requires playing a "video recording," something its device is not capable of doing. (*Id.*).

Plaintiffs counter that the claim makes no mention of a "video recording." (D.I. 17 at 19).

21

According to Plaintiffs, Defendant's argument goes to the "merits of [Plaintiffs'] allegations; not their plausibility." Again, I agree with Plaintiffs.

Plaintiffs have alleged that the Defendant's product "includes a controller that displays images of album art for song playing on one speaker, which requires a digital video processor." (D.I. 1-2 at 83). In addition to the claim language, Plaintiffs point to language from the specification that refers to a "video output signal . . . generated by [a] video processor." (*Id.*). In other words, Plaintiffs have alleged that Defendant's product infringes this claim because it plays a recording and produces video output using a video processor. Without engaging in claim construction and findings of fact related to Defendant's product, I cannot say as a matter of law that the accused product does not infringe this claim. The allegation that it does infringe is therefore sufficiently plausible to withstand a motion to dismiss.

Defendant's arguments with respect to the '899 patent carry more weight, however. Claim 1, the only independent claim addressed in Plaintiffs' preliminary infringement contentions, reads:

1. A method of playing back a recorded signal, comprising:
obtaining a recording identifier corresponding to the recorded signal; comparing the recording identifier with previously stored identifiers in a playback preference database; and
reproducing the recorded signal using previously stored preferences if the recording identifier is found in the playback preference database and using default preferences if the recording identifier is not found in the playback preference database.

('899 patent, claim 1). Defendant argues that Plaintiffs have not plausibly alleged infringement of the "recording identifier" limitation of this claim because the "identifier" Plaintiffs specify is a "room identifier," something Defendant contends identifies a room rather than a recording. (D.I. 10 at 24-25). Plaintiffs have alleged that Defendant's product "includes components that obtain a recording identifier (room identifier) corresponding to the recorded signal (music that is

22

already playing)." (D.I. 1-2 at 79). This plausibly alleges infringement of this limitation. As I
have already stated, I will not engage in claim construction or fact finding in the context of a
motion to dismiss. Therefore, I will not opine on the merits of Plaintiffs' allegation that the
"room identifier" meets the definition of "recording identifier" as contemplated by this patent;
rather, I simply find that the allegation is sufficient to meet the *Twombly/Iqbal* pleading
standards.

In the alternative, Defendant argues that Plaintiffs have not plausibly alleged
infringement of limitation requiring "comparing the recording identifier with previously stored
identifiers in a playback preference database." (D.I. 10 at 25). According to Defendant,
Plaintiffs "fail to identify any 'comparing' between the alleged 'identifier' and the alleged
'playback preference database.'" (*Id.*). In briefing, Plaintiffs did not respond to this argument.
With respect to this limitation, Plaintiffs have alleged only that Defendant's product "includes
room sound settings [that] can be changed from preset levels." I agree with Defendant that this
is insufficient. This allegation fails to describe a "recording identifier" that is compared with
"previously stored identifiers." In fact, this statement is devoid of any allegation that any
comparing is done at all. Therefore, I will dismiss Plaintiffs' Eighth Counterclaim with leave to
amend.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss (D.I. 9) is granted as to
the First, Third, and Eighth Counterclaims and denied as to the Second, Fourth, Fifth, and
Seventh Counterclaims. An appropriate order will be entered.